UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RICHARD MARTIN,

                    Plaintiff,                   Case Number 15-13553
                                                Honorable David M. Lawson

v.

HURON VALLEY AMBULANCE, INC.,
and EMERGENT HEALTH PARTNERS

                    Defendants.

_____/

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DISMISSING CASE

Plaintiff Richard Martin was fired from his job as a senior paramedic with defendants Huron Valley Ambulance, Inc. and Emergent Health Partners as a result of his response to a fatal motor-vehicle-bicycle accident. When Martin arrived at the scene of the tragic accident, he says that he was not able to operate at full capacity because he suffered an acute stress reaction from seeing what he believed to be a "dead teenager." The defendants claim to have terminated Martin because he did not follow medical protocols and he physically pushed one of the bystanders (who happened to be a nurse attempting to render aid) at the scene. Martin contends that the defendants perceive him to be suffering from a disability — an acute stress disorder — which was the true reason for his firing. His claims in this case are based on Americans with Disabilities Act. Before the Court is the defendants' motion for summary judgment, which was argued October 25, 2016. The undisputed facts show that the defendants' reasons for firing Martin are lawful and legitimate, and they are not a pretext for unlawful discrimination. Therefore, they are entitled to judgment in their favor as a matter of law, and the motion for summary judgment will be granted.

I.

A.

The event in question occurred midday on June 15, 2014. Martin was dispatched to respond to a priority one call of a car-pedestrian personal injury accident. A priority one call is a life-threatening emergency. Although not all priority one calls end up being life-threatening, Martin recalls receiving information en route that this was a serious accident. On that day, Martin's partner was Michael Meunier. Martin was in charge of the team because he was a senior paramedic, and Meunier was an EMT Basic. Meunier was not a paramedic, meaning he could not provide certain services, such as advanced cardiac life support (ALS).

When Martin arrived at the scene, he remembers "looking out the window [of the ambulance] and seeing this kid against the curb. He was broken up. His head was in an unnatural position. His skin was pale because there was no blood getting out to it, basically. It was white." Martin said that the patient was "obviously dead." Nonetheless, Martin acknowledged that he still had to investigate because he was working under medical control protocols that he was required to follow as a licensed paramedic in Michigan.

Under Michigan's "Dead On Scene" protocols, cardiopulmonary resuscitation (CPR) is to be started on all patients unless, among other things, the patient has

> D.    Obvious mortal wounds/conditions (injuries inconsistent with life – i.e., crushing injuries of the head and/or chest).
> . . .
> G.    Blunt or penetrating traumatic arrest found pulseless and apneic (without agonal respirations) without organized electrical activity (must be asystolic *or other rhythm with rate less than 40/min*). Patients with ventricular fibrillation, ventricular tachycardia or organized rhythms greater than 40/min should have resuscitation initiated. Patients not meeting these criteria should have full resuscitation and prompt transport initiated. Special attention

-2-

should be taken so mechanism of injury is consistent with condition of the patient.

(Emphasis added). If the patient is determined to be "dead on scene," the protocols require the medical examiner to be contacted and the patient to remain at the scene.

Under Emergent Health Partners (EHP) policy, Martin was also required to bring a cot, a jump kit, oxygen, and a monitor to the patient's side when he exited the ambulance. The jump kit included things such as intravenous (IV) equipment, airway equipment, and a bag valve mask (BVM). Furthermore, under both EHP policy and Michigan protocols, Martin was required to perform what is called the "A, B, Cs," which stand for airway, breathing, and circulation. As part of the initial assessment, a paramedic is required, as quickly as possible, and in order, to open the patient's airway, check for breathing and begin ventilation, and then address circulation by checking the patient's pulse and beginning CPR, attaching a monitor, and administering drugs. Martin was not required to follow those procedures if the patient was dead.

Martin first determined that the patient had no pulse by checking the carotid pulse, and he determined that the patient was not breathing by observing him for five to 10 seconds. The backboard and the C-collar were not immediately brought to the patient. Meunier retrieved the C-collar bag and the backboard after observing the patient. Martin concedes that under the protocols, he was required to secure the patient to the backboard before moving him, but he did not do so. Martin agrees that he was required to immobilize the patient's neck with the C-collar and immobilize his head with "head blocks," but he failed to do so.

Under the dead-on-scene protocols, if the patient was determined to be dead, he should not be moved. Despite Martin's belief that the patient was deceased, he transported him to the

-3-

ambulance.  Martin says that even though he knew the patient was dead, he "wanted to get him off the pavement."  He did not want the patient's mother "to find him on the curb."

Martin's supervisor, Jim Stevens, arrived on the scene after the patient had been loaded into the back of the ambulance.  According to Stevens, "[u]pon entering the back of the ambulance [he] noticed a young male patient on a backboard with EMT Meunier doing chest compressions, while a City of Jackson Fire Fighter was performing ventilations."  Martin was sitting in the ambulance attendant seat looking at the cardiac monitor, which was showing a pulse electrical activity (PEA) rhythm with a rate of 40 to 48 beats per minute.  He said that the "patient was found with no straps, [cervical immobilization device] or ALS procedures established."  When Stevens asked Martin what he needed, "Martin was slow in responding and would only respond, 'The kid is dead.'"  Stevens explained that because the patient was in PEA rhythm, and because the patient was already loaded, he told the crew members that the patient should be treated.  Stevens started an IV and pushed the first round of cardiac drugs while Martin remained in the attendant seat.  Stevens assisted the crew in properly securing the patient to the backboard, while Martin called Allegiance Health System Emergency Department on a cell phone. The Allegiance personnel said to bring the patient in, and Martin was told to establish an ALS airway and begin transport.

A Jackson City police cruiser dashcam captured the events near the patient.  The video shows the police cruiser pulling up to a scene with approximately a dozen bystanders surrounding the patient, who was lying facing the curb.  A woman, later identified as Susan Shore (a nurse and former EMT), can be seen tending to the patient.  When Martin's ambulance pulled up to the scene, Martin did not exit the vehicle immediately.  Ms. Shore can be seen approaching the vehicle and gesturing to Martin to exit the vehicle as she returned to the patient.  When Martin approached the

patient, he can be seen pointing at Ms. Shore as she is kneeling next to the patient and physically pushing her aside. Martin used enough force to cause Ms. Shore to use a hand to keep from falling. It appears that the only equipment carried by Martin was a stethoscope around his neck and a pair of gloves in his hands. Martin's partner approached the patient and then retrieved the backboard and collar bag from the ambulance. The patient was rolled on to the backboard, and Martin's partner began chest compressions as Martin used the stethoscope on the patient. Martin eventually placed a neck collar on the patient as a stretcher was brought over by the Jackson Fire Department's response team. The patient was lifted onto the stretcher, but not secured, and moved out of view of the dashcam.

The patient was pronounced dead after he was transported to the hospital.

## B.

On June 18, 2014, a few days after the incident, Ms. Shore called in a complaint. Supervisor David Larrowe received Ms. Shore's telephone call and documented the following concerns:

1.  When our crew arrived on scene they sat in the rig and didn't get out. She had to "get them and tell them this is serious." The older guy just had a collar bag and his partner only had a backboard.
2.  "They started CPR but did no airway at all."
3.  The older guy made comments like, "This guy is dead," and "I don't know why we are doing this."
4.  Ms. Shore feels that the crew did not follow proper protocols or procedures.
5.  Ms. Shore stated that the older guy "rudely" pushed her out of the way.

According to Larrowe, Ms. Shore said that she wanted to contact the family of the patient and "tell them everything so that they could get a lawyer." An investigation began the following day.

A week after the incident, Martin's supervisor, Jim Stevens, asked him to create an incident report. Martin wrote the following:

> Dispatched to car/pedestrian, found 17 y/o M struck by large SUV on bike, pt pulseless, apneic, no apical pulse on arrival, pts head apparently smashed curb, large amt of blood pooling, pt [with] angulated/dislocated appearing neck fracture, bystander/RN on scene, asked for gloves, wanted to do anything to help, 2 [Jackson Fire Department] crews also present, initially, I felt very frustrated [with] the fact the 17 y/o was dead for no good reasons.  I placed C-collar on pt, back boarded [with] JFD starting CPR,  decision to get pt back of rig and reevaluate [with] J. Stevens, pt placed on monitor Narrow Complex PEA at 40 found CPR continued, Jim [with] IV, EPI x 2 give, [Allegiance Health System Emergency Department] (Travis D-Dyc) contacted [with] decision to call pt, but resuscitation continued because of miscommunication "ie "bring him in" no pulses or even increased HR, 1 attempt at ET but Jaw discombobul[] [and] ventilation maintained BLS [with] BUM.

According to Martin, "narrow complex pulseless electrical activity at 40" means there was electrical activity in the heart, but no contractions.

Martin testified that when he saw "this dead teenager," he had an overwhelming sense of "frustration."  He characterized the feeling "like a sense of detachment and not being on the scene."  Martin testified that he "couldn't recall the times of anything.  All of [his] recall at the scene was wrong from the very beginning."  Martin described the feeling in the following manner:

> [I]t affected the whole recall of the scene; like none of my timelines, my mental timelines where we did the investigation and I saw the video were right; like who arrived when.
>
> Like one of the things I thought had happened is Jim Stevens arrived on the scene while we were back-boarding the boy.  He actually didn't arrive until after he was in the ambulance.
>
> So everything — I —
>
> It's very hard to describe.  And that's why I use 'frustration,' and that's not right.
>
> I think detachment is true, where I was like looking at the driver of the vehicle that killed him, some like eighty-year-old man, and thinking about him a little bit.
>
> And this is all while I was kind of doing, you know, assessing the patient and stuff.

-6-

He admits that he was not functioning at "a full level," but says that he did not know it at the time. He says that he has difficulty remembering the events.

Supervisor Stevens interviewed Martin on June 22, 2014 regarding the June 15, 2014 incident. Martin only recalled that Ms. Shore was present and asked for gloves so she could help, but Martin said that he did not pay much attention to her because he had all the help that he needed at that time. In a follow up interview on July 6, 2014, Martin was asked if he had anything further to add to his previous statements. Martin "replied that he did not in any way touch or interact[] with Ms. Shore."

Meunier recalls that Ms. Shore approached the ambulance saying "He is not breathing and you need to hurry up," and that she was a nurse and insisted on helping. According to Supervisor Stevens, Meunier appeared "reluctant to give in depth details of the event." Captain Todd Weaver of the Jackson City Fire Department said that he did not see any interaction between Martin and Ms. Shore, but he remembers "having a concern with Martin, he appeared 'lost and overwhelmed.' [He] went on to say that Martin appeared to be having difficulty making treatment decisions and gave no direction to his personnel as far as patient care."

According to Martin, about a week to 10 days after the incident, Stevens informed him that Ms. Shore made a complaint and that Larrowe was investigating the complaint. On July 14, 2014, Dirk Borton, Vice President of Western Operations for EHP, along with Larrowe, interviewed Martin. Borton explained that the investigation had been slow because there was difficulty contacting one of the responding police officers, who was on vacation. Borton and Larrowe then reviewed the recently-obtained dashcam video with Martin. Borton noted that it took approximately 17 seconds for Martin and his partner to exit the vehicle. Martin responded that he must have been

on the radio or talking to his partner, but in any event he did not feel it was an extended amount of time.  Borton addressed the physical contact with Ms. Shore.  Martin had no recollection touching Ms. Shore.  When asked about the care provided to the patient, Martin said he just knew the patient was dead, and making the decision to move him to the ambulance was because it was a more dignified place than the curb.

Martin was placed on administrative leave beginning the following day, and told that another meeting would take place to allow him to further comment on the dashcam video.  However, later that same day, Larrowe came to Martin and told him that Borton wanted to meet with him the next day.  Martin sent a text message to Borton asking if he was going to be terminated.  Borton responded with a text saying he would get back to Martin at a later time and the meeting scheduled for the following day was cancelled.

The defendants' investigation found that Martin "did not comply with protocols, or the standard of care, during the resuscitation efforts of his patient."  He delayed exiting the vehicle, did not bring the proper equipment to the patient, did not ventilate or secure the airway until the patient was in the ambulance, the patient was not secured to the backboard, and no ALS treatment was established except for the ECG monitoring.  Additionally, EHP determined that Martin had grabbed Ms. Shore and pushed her backward causing her to lose her balance.  EHP found Martin's actions to be violations of EHP's code of conduct for "Willful or careless behavior or actions which create unsafe or threatening circumstances for employees, patients, or visitors" contrary to EHP Code of Conduct sections E-10 and A2, and "Inconsiderate or abusive treatment of a patient or performing negligent act(s) that do not adversely affect the welfare of a patient, visitor, employee or other individual," contrary to sections E-10 and B1.  After the August 11 meeting, the defendants

-8-

consulted with their attorneys to make sure they could proceed with Martin's termination because of protocol violations in light of Martin's earlier assertions about an acute stress reaction. Apparently satisfied they were on solid ground, the defendants terminated Martin on August 15, 2014.

### C.

Martin received his EMT training at Lansing Community College in 1986. He worked as an EMT for more than 25 years and estimates that he has seen approximately 30,000 patients during his career. Martin began working for Huron Valley Ambulance (HVA) in 1996, and later EHP when it took over HVA in 2013. For the duration of his employment with HVA and EHP, he worked at the Jackson Community Ambulance facility. He consistently received annual reviews that said he either met his employer's standard or exceeded the standard. However, his performance history was not without faults. His personnel file contained a number of incident reports from March 8, 2011 to August 15, 2015. Generally the incident reports addressed damage to vehicles and the like. However, one incident led to a performance improvement plan (PIP) based on allegations of sexual harassment.

In 2013, a co-worker, whom Martin was mentoring, reported expressions of unwanted affection by Martin. EHP put him on a 12-month PIP, directing Martin to change the alleged behavior. It also instructed him to change the types of jokes he told to others while he was representing EHP. The incident had repercussions in Martin's personal life. He and his significant other almost separated over the matter. His blood pressure increased. He had difficulty sleeping. And on August 1, 2013, his physician, Dr. James Taylor, diagnosed him with general anxiety disorder and wrote in Martin's progress notes that he "needs to see counselor!" Martin began taking

Atenolol in 2008 for his high blood pressure, but the dosage was increased during this period. He also began taking Buspar and Lexapro for anxiety, and Trazodone to help with sleep. However, according to Martin, the added stress did not impact the treatment of his patients. After six months, EHP determined that Martin had been compliant with the terms of the PIP and took no further corrective action. Martin never reported his general anxiety disorder to EHP.

On July 17, 2014, three days after the meeting with Dirk Borton was cancelled, Martin consulted his doctor, in part, because of stress caused by his concern that he was going to be terminated for pushing Ms. Shore. On July 19, 2014, Martin presented EHP with a physician's note excusing him from work "due to illness/injury." On July 31, 2014, Martin's physician cleared him to return to work on August 10, 2014 with no restrictions. Martin was then placed back on administrative leave and asked to meet with Borton the following day. On August 11, Martin again met with Borton and Larrowe. At that time, Martin stated his belief that he had experienced an acute stress reaction which made it difficult to make treatment decisions during the June 15 incident. Martin mentioned in his deposition that in retrospect he believes he had a similar experience 20 years ago, although he was not reminded of that episode until after he was terminated. Martin said that he had a difficult year that included many stressful events, but now that he had some time off and some counseling, he felt "a thousand times better" and realized "he was just not there for the call in question and other moments over the last few months."

Martin testified that on June 15, 2014 he suffered an acute stress reaction at the scene of the accident. Martin says he had not suffered from this type of disability before. He described it as a feeling of being "shellshocked." Martin says that after June 15, 2014 the condition exacerbated and

-10-

he began experiencing post-traumatic stress disorder (PTSD) symptoms, which continued for the next year, and he occasionally still suffers from those symptoms.

D.

After he was fired, Martin subsequently filed a grievance with EHP. On September 8, 2014, he was informed that his grievance could not be resolved. On November 4, 2014, Martin filed a charge against the defendants with the National Labor Relations Board (NLRB) alleging that the defendants unfairly and unlawfully terminated him in retaliation for his pro-union views. In a statement made to the NLRB investigator, Martin described the June 15, 2014 incident in a slightly different manner. Martin says that he and Meunier secured the patient to the backboard, and they began CPR on the street. He says that he and Meunier continued the CPR once inside the ambulance, which is where he says he was when Stevens arrived at the scene. He says that he asked Stevens if he should continue with CPR, and Stevens instructed him to continue. In the statement, Martin asserts that he was told he was terminated for failure to follow trauma protocol, failure to follow pre-hospital trauma life support, delay of transport, and for pushing a bystander. But he contends that EHP never told him which protocols he failed to follow. On April 27, 2015, the NLRB dismissed Martin's charge because there was insufficient evidence to establish a violation of the National Labor Relations Act.

Martin then filed a complaint with the Equal Employment Opportunities Commission (EEOC). The EEOC decided not to proceed with Martin's case. However, in their position statement to the EEOC, the defendants said that Ms. Shore's complaint prompted an investigation

-11-

to review "the professional practices in responding to the accident and treatment of the victim." The letter concluded that Martin was terminated because

> a determination was made that Charging Party violated the Company's Code of Conduct E-10, AC, "willful and careless behavior actions which create unsafe or threatening circumstances for employees, patients, or visitors" as well as E-10, B1, "inconsiderate abuse or treatment of a patient or performing negligent acts that do not adversely affect the welfare of a patient, visitor, employee, or other individual." Based on those violations, Charging Party's employment was terminated on August 11, 2014.

This language mirrors that used in the investigation.

Martin received a right-to-sue letter on October 13, 2015. He filed his complaint in this Court on October 9, 2015, an amended complaint on December 18, 2015, and a second amended complaint on January 11, 2016 naming EHP as an additional defendant. The second amended complaint alleges in a single count that the defendants violated the Americans with Disabilities Act, 42 U.S.C. § 12112, by terminating Martin because of an actual or perceived disability and failing to attempt to accommodate that disability.

## II.

The defendants argue in their motion for summary judgment that Martin has not offered evidence that he has a disability within the meaning of the ADA or that the defendants regarded him as suffering from a disability, the undisputed facts show that Martin is not able to think clearly, he is not qualified to perform the position of Paramedic II and Martin never requested an accommodation, that their reasons for terminating him were lawful and legitimate, and the stated basis for termination was not a pretext for unlawful discrimination. Martin disputes each of these arguments.

-12-

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When reviewing the motion record, "[t]he court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).

"The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." 576 F.3d at 558. (citing *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002)). "Once that occurs, the party opposing the motion then may not 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Id.* (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)).

"[T]he party opposing the summary judgment motion must do more than simply show that there is some 'metaphysical doubt as to the material facts.'" *Highland Capital, Inc. v. Franklin Nat'l Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)) (internal quotation marks omitted). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. If the non-moving party, after sufficient opportunity for discovery, is unable to

-13-

meet her burden of proof, summary judgment is clearly proper. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis Health Care Centre v. Shalala*, 205 F.3d 937, 943 (6th Cir. 2000). A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics & Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting 477 U.S. at 248).

Congress enacted the ADA in an effort to "eliminate[] discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). The Act prohibits qualifying employers from "discriminat[ing] against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). Employers cannot take adverse employment actions against an employee "because of" an employee's disability. 42 U.S.C. § 12112(b)(1). The Sixth Circuit determined that the "because of" language in the ADA sets a "but for" causation standard. *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 318 (6th Cir. 2012) (en banc) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177-78 (2009)).

A plaintiff may show disability discrimination by "'introducing direct evidence of discrimination, including evidence that the employer relied upon the plaintiff's disability in making its employment decision, or by introducing indirect evidence of discrimination.'" *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 891 (6th Cir. 2016) (quoting *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1178 (6th Cir. 1996) *abrogated in part by Lewis*, 681 F.3d 312). Martin argues that there is

-14-

direct evidence of the defendants' disability discrimination, but in the alternative there also is indirect evidence of discrimination.

A.

To establish a claim of discrimination, a plaintiff must show that (1) he is disabled, or his employer regards him as having a disability, (2) he otherwise is qualified to perform the essential functions of the job, either with or without accommodation, and (3) he suffered an adverse employment action because of his disability. *Ferrari*, 826 F.3d at 891 (citing *Monette*, 90 F.3d at 1178). The plaintiff can establish the third element of his claim "'by introducing direct evidence of discrimination, including evidence that the employer relied upon the plaintiff's disability in making its employment decision.'" *Ibid.* "Direct evidence of discrimination is that evidence which, if believed, requires the conclusion that unlawful discrimination was [the] motivating factor in the employer's actions. It does not require the fact finder to draw any inferences to reach that conclusion." *Sharp v. Aker Plant Servs. Grp., Inc.*, 726 F.3d 789, 798 (6th Cir. 2013) (quoting *Wexler v. White's Fine Furniture, Inc.,* 317 F.3d 564, 570 (6th Cir. 2003) (en banc), and *Amini v. Oberlin Coll.,* 440 F.3d 350, 359 (6th Cir. 2006)) (quotation marks omitted).

The plaintiff argues that a number of the defendants' actions, "by the process of elimination," lead to the inescapable conclusion that Martin was discharged because of his disability. When questioned about that assertion at oral argument, the plaintiff acknowledged that reasoning by the process of elimination requires a fact finder to draw inferences, which amounts to circumstantial evidence, not direct evidence.

"Discriminatory remarks by decision makers and those who significantly influence the decision-making process can constitute direct evidence of discrimination." *Ibid.* (citations omitted).

-15-

But the plaintiff has offered no such evidence.  Instead, he points to the defendants' consultation with their attorneys about Martin's acute stress reaction just before they notified him of his termination.  Next, he says that the defendants' statements to the EEOC that Martin was terminated because he pushed Ms. Shore will not hold up because no such incident occurred.  Those bits of evidence in combination, he argues, must lead to the conclusion that his termination was because he was regarded as having a stress disorder.  But neither situation *requires* the conclusion that the plaintiff's disability was the "but for" cause of the defendants' decision to terminate him.  The plaintiff cannot establish causation on a direct-evidence theory.

B.

A plaintiff also may establish discrimination by circumstantial evidence.  *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 547-48 (6th Cir. 2004).  If, as here, the plaintiff fails to offer any direct evidence of discrimination, the Court applies the three-step legal analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later clarified by *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981).  *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 453 (6th Cir. 2004).  Under the *McDonnel Douglas* structure, "the employee has the initial burden of establishing [her] prima facie case; if [s]he does so, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions; finally, the employee has the burden of rebutting the employer's proffered reasons by showing them to be pretextual."  *Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 427 (6th Cir. 2014).

1.

A *prima facie* case under the ADA requires proof that (1) the plaintiff was disabled, (2) he otherwise was "qualified for the position, with or without reasonable accommodation, (3) he . . .

-16-

suffered an adverse employment decision, (4) the employer knew or had reason to know of the plaintiff's disability, and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced." *Ferrari*, 826 F.3d at 891-92 (citing cases).  The parties focus their arguments on the first two elements of *prima facie* case and ignore the last three.  The third and fourth elements are easily demonstrated;  Martin suffered an adverse employment action when he was terminated, and the defendants were aware of his acute stress reaction before his termination.

a.

The defendants argue that Martin was not disabled within the meaning of the ADA.  An individual is disabled under the ADA if the individual has or is regarded as having "a physical or mental impairment that substantially limits one or more major life activities."  42 U.S.C. § 12102(1)(A) & (C).  A major life activity includes, among other things, "concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).  The definition of disability is "construed in favor of broad coverage of individuals."  42 U.S.C. § 12102(4)(A).  However, an individual will not be "regarded as" having a disability if the "impairment[] . . . [is] transitory and minor," meaning that the "impairment['s]  . . . actual or expected duration [is] 6 months or less."  42 U.S.C. § 12102(3)(B).  Nonetheless, "[t]he primary object of attention in cases brought under the ADA should be whether [employers] have complied with their obligations and whether discrimination has occurred, not whether the individual meets the definition of disability. The question of whether an individual meets the definition of disability . . . should not demand extensive analysis."  29 C.F.R. § 1630.1(c)(4).

-17-

Martin argues both that he has an actual disability and that he was regarded as having a disability. The defendants argue that Martin was not regarded as having a disability because the acute stress reactions were transitory and minor. The parties focus primarily on the "regarded as" prong under the ADA, but Martin need only demonstrate he qualifies under one of the definitions to receive coverage under the ADA. 29 C.F.R. § 1630.2(g)(2). Martin argues that he suffered from an acute stress reaction on June 15, 2014, which affected his ability to concentrate and think. He stated that he had a similar reaction 20 years ago and has continued to suffer PTSD-like symptoms since that time. His evidence, although thin, is sufficient to survive a motion for summary judgment on whether he has an actual disability. "[A] reasonable finder of fact could find that [the plaintiff] has an episodic disability that substantially limits a major life activity when active, and therefore he meets the definition of disabled." *Deister v. AAA Auto Club of Michigan*, 91 F. Supp. 3d 905, 918 (E.D. Mich. 2015) (finding an acute stress reaction may qualify as a disability under the ADA).

b.

The defendants argue that thinking clearly is an essential job function, and if Martin is not able to think clearly, he is not qualified for the position of a paramedic. A person is "qualified" for employment if he, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Martin never sought an accommodation, and he does not argue now that one was required. Instead, he notes (accurately) that the defendants' argument is inconsistent with its position that his stress disorder — which impaired his ability to concentrate — is not a disability. He also points out that at the time of his termination he had been cleared by his physician to return to work.

-18-

The plaintiff has the better argument. "The relevant time for determining whether the plaintiff is a 'qualified individual with a disability' is at the time of discharge." *Griffith v. Wal-Mart Stores, Inc.*, 135 F.3d 376, 380 (6th Cir. 1998) (citing *Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876, 884 (6th Cir. 1996)). There is no evidence in the record that the defendants ever believed Martin was not qualified for his position. Martin has been a paramedic for over 25 years and continues as one to this day. After the June 15, 2014 incident, Martin continued as a senior paramedic while the investigation was conducted. A reasonable jury would have no difficulty finding that Martin is qualified for the position of a paramedic even without an accommodation. The plaintiff has satisfied his burden on this element.

The plaintiff has established a *prima facie* case.

### 2.

Similarly, the defendants have met their burden of articulating a legitimate, non-discriminatory reason for firing Martin. The defendants' "burden is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)). The defendants argue that Martin was terminated because he did not follow medical protocols, company policies, and pushed Ms. Shore. Those reasons suffice to move the analysis to the next step of the *McDonnel Douglas* protocol.

### 3.

The plaintiff can create a fact question on whether the defendants' reason for termination was a pretext for illegal discrimination by offering some evidence "'(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3)

that they were insufficient to motivate the employer's action.'" *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012) (quoting *Romans v. Mich. Dep't of Human Servs.*, 668 F.3d 826, 839 (6th Cir. 2012)). Martin argues that the push of Ms. Shore could not have been the real reason for his termination, even though the defendants' position at the EEOC proceeding was that the push was the only reason for the firing, since the dashcam shows that the push was "much ado about nothing." And he insists that the criticism about patient care has no basis in fact, because the applicable protocols did not call for life-saving measures where the patient was dead at the scene.

These arguments are unpersuasive. Martin has not offered evidence that creates an issue of fact on the question of pretext. There is no dispute that the defendants initiated an investigation into Martin's conduct based on Ms. Shore's complaint. The investigation was delayed because one of the responding officers was on vacation and could not be immediately contacted. Once the defendants received the dashcam video, however, the defendants had enough information to proceed with the investigation and did so promptly. There is no evidence that the defendants were even aware of Martin's alleged disability until the very end of the investigation into his conduct.

The defendants immediately reviewed the dashcam video with Martin. The video showed a different version of the events than those reported by Martin. Martin said he did not grab or push Ms. Shore; the video shows that he did. Martin also argues that his physical contact with Ms. Shore was minor and did not amount to much. However, Martin cannot at this point dispute that the contact occurred. How severe the contact was may be in dispute, but not that it happened. The defendants have a policy against such conduct that "create[s] unsafe or physically threatening circumstances for . . . others." Code of Conduct ¶ A2. Martin's "shove" of Ms. Shore, which caused her to lose her balance, reasonably could qualify as such.

-20-

Martin says that he followed protocol; but the video shows that he did not bring the appropriate equipment with him to the patient, he did not initiate ALS, and he did not secure the patient to the backboard.  Martin argues that there is a dispute as to whether he was required to follow certain protocols, because as he has said repeatedly, the patient was deceased by the time he arrived.  However, the protocols call for specific procedures unless the patient is "pulseless and apneic (without agonal respirations) without organized electrical activity (must be asystolic or other rhythm with rate less than 40/min)."  When Stevens arrived, Martin was seated in the ambulance watching the monitor that showed the patient's PEA rhythm between 40 to 48.  Stevens ordered protocols to be followed, the Allegiance Emergency Department instructed the patient to be taken to the emergency room, and every other emergency responder on the scene appears to have followed the relevant procedures and protocols for a victim in the patient's condition.

This evidence is undisputed, and entitles the defendants to the benefit of the "honest belief rule."  *See Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012).  "Under [this] rule, an employer's proffered reason is considered honestly held where the employer can establish it reasonably reli[ed] on particularized facts that were before it at the time the decision was made."  *Ibid.* (quoting *Joostberns v. United Parcel Servs., Inc.*, 166 F. App'x 783, 791 (6th Cir. 2006)).  To overcome that rule, the plaintiff must "produce sufficient evidence to establish that the employer failed to make a reasonably informed and considered decision before taking its adverse employment action."  *Ibid.* (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)).

There is no proof that the defendants failed to consider all of the available evidence before taking action.  But Martin says that the defendants took an inconsistent position before the EEOC, relying in their letter only on the shove of Ms. Shore to justify the firing.  However, Martin's

characterization of the defendants' EEOC position letter is not accurate. The letter does not say that the sole reason Martin was terminated was because of the physical contact he had with Ms. Shore. The letter says that an investigation was conducted to review his professional behavior and his treatment of the patient. It then states, in broad terms, that Martin violated company policies that apply to both patients and bystanders, and quotes the relevant language. The letter's language encompasses all of Martin's behavior, not merely the act of pushing Ms. Shore.

Martin also insists that the defendants acknowledged a concern over his stress-related disability. But the undisputed evidence shows that the only time the defendants discussed Martin's disability was when he raised the issue after July 19, 2014, and they consulted their attorneys about whether they could still move forward on his termination. That precautionary contact with their attorneys is not evidence of disability discrimination. Nor does it undermine the defendants' legitimate reasons for the termination.

It is not difficult to believe that Martin suffered from an acute stress reaction during the June 15, 2014 incident, and that it affected his ability to respond appropriately to the situation. But he cannot show that his termination was "because of" his disability. To succeed, Martin does not have to show that his termination was based "solely" on his disability, but he must show that his termination would not have occurred "but for" his disability. The undisputed evidence demonstrates, however, that the defendants had decided to terminate Martin before he ever notified them of his disability. As Martin acknowledges, the defendants "talked to their attorneys about the 'disability' and informed them that they wished to move forward with his termination because of protocol violations." Martin has not shown that the defendants' reasons for terminating him were pretextual.

-22-

III.

The undisputed evidence shows that the defendants fired the plaintiff for legitimate reasons. The plaintiff has not offered evidence sufficient to create a genuine issue of fact that those reasons were pretextual, or that he would not have been fired but for his disability.

Accordingly, it is **ORDERED** that the defendants' motion for summary judgment [dkt. #29] is **GRANTED**.

It is further **ORDERED** that the second amended complaint is **DISMISSED WITH PREJUDICE**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   December 28, 2016

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on December 28, 2016.

s/ Susan Pinkowski
SUSAN PINKOWSKI

---